UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| JOSÉ DAVILA, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | No. 3:10cv366-FM |
| | § | |
| UNITED STATES, et al., | § | |
| Defendants. | § | |

## MOTION FOR SUMMARY JUDGMENT
## BY DEFENDANTS IFTIKHAR KHAN, BLAKE TRESTER,
## PHIL BASAK, BRIAN SIKES & MARK SPIER

Defendants Iftikhar Khan, Blake Trester, Phil Basak, Brian Sikes, and Mark Spier respectfully move this Court under Federal Rule of Civil Procedure 56 to grant them summary judgment on Plaintiffs' claims against them.

### OVERVIEW

The claims at issue in this motion arise from the second of two stops.  On April 4, 2009, United States Park Rangers Iftikhar Khan, Blake Trester, Phil Basak, Brian Sikes, and Mark Spier received an alert that a car associated with a fugitive felon was headed toward the U.S.–Mexico border through Big Bend National Park.  Just three months prior, that fugitive had fled at high speed from a stop at a United States Border Patrol checkpoint, assaulted a law enforcement officer trying to apprehend him, and then assaulted another law enforcement officer after he had been apprehended.  The Rangers found the car, stopped it for speeding, and, because of that prior incident, treated the stop as high-risk.  Following the protocol for high-risk stops, the Rangers drew their weapons, required the occupants to exit one-by-one, handcuffed them, and then briefly checked the car's interior and trunk to ensure no one was hiding there.  After identifying the car's occupants, investigating the driver's lack of a valid license, and ensuring that his recent consumption of alcohol had not rendered him unsafe to drive, the Rangers sent them on their way.

Plaintiffs are José Davila, driver of the car and father of the fugitive, and Marcela Duarte, a passenger in the car. They fault the Rangers for detaining them and for treating the stop as high-risk, and they allege that the Rangers unlawfully searched the car. Based on these allegations, they seek money damages from the Rangers' personal resources for purported Fourth Amendment violations. The Rangers, however, are immune from Plaintiffs' claims. Qualified immunity protects law enforcement officers when, as in this case, they act reasonably in light of the information available to them. Because qualified immunity bars Plaintiffs' claims, this Court should dispose of those claims now by granting the Rangers summary judgment.

## SUMMARY JUDGMENT STANDARD

A party may move for summary judgment "at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). A court should grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

In many situations, a movant bears the burden of showing there is no genuine issue of material fact, but the assertion of qualified immunity "alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc). The plaintiff "must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Brown*, 623 F.3d at 253.

## STATEMENT OF THE CASE

### A. Factual Background.

The facts material to this motion are laid out in the Defendants' Appendix. Briefly put, they show that on April 4, 2009, the Rangers received an alert that a car associated with a fugitive felon was headed toward Big Bend National Park on a road leading to a border crossing.

SOF ¶¶ 18, 20-24.[1]  The fugitive had recently fled from a Border Patrol checkpoint and been involved in a violent confrontation with law enforcement.  *Id.* ¶ 22.  The Rangers met briefly and decided that, if they had reason to stop the car, they would perform a "felony stop."  *Id.* ¶¶ 24-25. A felony stop is a protocol for a vehicle stop that law enforcement officers use when the vehicle's occupants might attack, resist, or flee.  *Id.* ¶ 25.

The Rangers then set out to locate the car.  *Id.* ¶ 26.  When Ranger Basak encountered the car, it was speeding, and when he pulled in behind the car, he saw it was weaving.  *Id.* ¶¶ 26-31. The car pulled over, and Rangers Basak, Khan, Trester, and Sikes pulled in around it.  *Id.* ¶ 32-34.  Following the "felony stop" protocol, the Rangers drew their weapons and shielded themselves behind their vehicles' doors.  *Id.* ¶ 35.  One at a time, the car's occupants were told to get out of the car, to walk backwards toward the Ranger vehicles, and to kneel to be handcuffed. *Id.* ¶¶ 36-39.  They were then escorted behind the Ranger vehicles and, after a few minutes, seated in separate Ranger vehicles.  *Id.* ¶¶ 36-41.  The Rangers then briefly checked the car's passenger compartment and trunk to ensure no one was hiding inside.  *Id.* ¶¶ 40-43.

Once the Rangers were satisfied that no one else was in the car, they checked the occupants' identification, asked them about the purpose of their trip, and ran records checks.  *Id.* ¶¶ 45-49.  The driver, Plaintiff José Davila, had an expired license.  *Id.* ¶ 45.  He also smelled of alcohol and admitted to having been drinking, so the Rangers administered a preliminary breath test.  *Id.* ¶¶ 51-55.  Once the Rangers had received the results of the records checks, and resolved their concerns about Plaintiff Davila's drinking, the stop ended.  *Id.* ¶¶ 58-59.

### B. Procedural Posture.

In October 2010, Plaintiffs sued the United States, the Rangers, and several unknown law enforcement officers for damages.  *See* Compl. (Doc. 1).  The claims against the United States are addressed in a separate motion, and the unknown law enforcement officers have not been named or served.  This motion addresses the claims against the Rangers in their respective

---

[1] "SOF" refers to the Federal Defendants' Summary of Facts filed with the Federal Defendants' Appendix.  *See* Local Rule CV-7(c).  The Summary includes pinpoint references to supporting declarations and court records.

individual capacities — namely, the Fifth Cause of Action for an allegedly unlawful search and seizure, *see id*. ¶¶ 86-90, and the Sixth Cause of Action for alleged use of excessive force, *see id.* ¶¶ 91-99.

## ARGUMENT

Plaintiffs have sued Rangers Khan, Trester, Basak, Sikes, and Spier in their individual capacities and seek to recover damages from their personal resources.  Compl. ¶¶ 10-11.  In individual-capacity suits, "qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Individual-capacity suits "can entail substantial social costs."  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  These costs include not only "the deterrence of able citizens from acceptance of public office," *Harlow*, 457 U.S. at 814, but also "the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties," *Anderson*, 483 U.S. at 638.  Qualified immunity is designed to minimize these costs.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1953 (2009); *Anderson*, 483 U.S. at 638; *Harlow*, 457 U.S. at 814.  The protection afforded by qualified immunity is accordingly "ample."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  The doctrine shields "all but the plainly incompetent or those who knowingly violate the law," *id.*, and applies "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  *Pearson*, 129 S. Ct. at 815 (internal quotation marks omitted).

Deciding a summary judgment motion based on qualified immunity involves answering two questions, either of which the court may address first.  *Brown*, 623 F.3d at 253.  The court must determine whether the defendant's conduct violated a plaintiff's constitutional right.  *Id.*  If not, the defendant is immune.  *See Terry v. Hubert*, 609 F.3d 757, 761 (5th Cir. 2010).  The court must also determine whether the right was "clearly established."  *Brown*, 623 F.3d at 253.  For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson*, 483

U.S. at 640.  Although "the very action in question" need not have been previously held unlawful, "in the light of pre-existing law the unlawfulness must be apparent." *Id.*  In essence, to overcome qualified immunity, a plaintiff must show that "no reasonable officer could have believed his actions were proper." *Brown*, 623 F.3d at 253.

Plaintiffs cannot carry their burden of showing that the Rangers violated their constitutional rights, much less that the Rangers violated a right so clearly established that no reasonable officer could have believed their actions were proper.  The Rangers had cause to stop the car because it was speeding, and the evidence of other potential crimes uncovered during the stop — especially driving under the influence of alcohol — justified extending it.  The Rangers' protective sweep of the car during the stop was reasonable in light of the information they received linking the car to a wanted felon with a history of violence and flight.  And because of the potential presence of that wanted felon, the tactics used by the Rangers to maintain control during the stop did not amount to excessive force.

I. **THE RANGERS ARE ENTITLED TO QUALIFIED IMMUNITY FROM PLAINTIFF'S UNLAWFUL-SEIZURE CLAIMS BECAUSE DETAINING PLAINTIFFS DID NOT VIOLATE ANY CLEARLY ESTABLISHED FOURTH AMENDMENT RIGHTS.**

In their Fifth Cause of Action, Plaintiffs assert that the Rangers violated their Fourth Amendment rights by detaining them "without legal justification" during the traffic stop on April 4, 2009.  Compl. ¶ 87.  This assertion does not survive scrutiny.  "[T]he Fourth Amendment is not 'a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures.'"  *United States v. Sanchez-Peña*, 336 F.3d 431, 436 (5th Cir. 2003) (quoting *United States v. Sharpe*, 470 U.S. 675, 682 (1985)).  The traffic stop at issue here was constitutional because it was reasonable; the Rangers stopped the car for speeding and continued it only so long as was necessary under the circumstances.  For the same reasons, the traffic stop was not so clearly unreasonable that qualified immunity would not protect the Rangers.

A traffic stop is consistent with the Fourth Amendment if it satisfies a two-part standard. *See United States v. Pack*, 612 F.3d 341, 349-50 (5th Cir.), *modified on other grounds on denial of reh'g*, 622 F.3d 383 (5th Cir.), *and cert. denied*, 131 S. Ct. 620 (2010).  First, the court asks

"whether or not the officer's decision to stop the vehicle was justified at its inception." *Id.* at 350.  A stop is justified if there is "reasonable suspicion to believe that criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted).  To decide whether reasonable suspicion supports a stop, a court looks at the totality of the circumstances and asks whether the officer, in light of his training and experience, has a particularized and objective basis for suspecting legal wrongdoing. *Arvizu*, 534 U.S. at 273.  "[T]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying the a preponderance of the evidence standard." *Id.* at 274.  The officer's subjective motives for the stop are irrelevant. *Sanchez-Peña*, 336 F.3d at 437.  Second, the court asks "whether or not the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place." *Pack*, 612 F.3d at 350.  For instance, "[i]f the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain [a vehicle's] occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *Id.*

The stop in question satisfies both parts of this standard.  The traffic stop was justified at its inception because the car was speeding. *See* SOF ¶ 29; 36 C.F.R. § 4.21 (prohibiting speeding in national parks); *cf. Whren v. United States*, 517 U.S. 806, 810 (1996) (explaining that stop was reasonable where police had probable cause to believe that traffic violation occurred); *Pack*, 612 F.3d at 350 (explaining that if vehicle was speeding, stop was justified at inception).  Once the car had stopped, the Rangers' subsequent actions were all reasonably related in scope to the circumstances.  To the extent the Rangers' decision to treat the stop as high-risk lengthened the stop, that decision was reasonable.  Law enforcement officers may rely on an reports or be-on-the-lookout (BOLO) alerts from other officers in deciding whether and how to conduct an investigatory stop. *See United States v. Rodriguez*, 564 F.3d 735, 742 (5th Cir. 2009); *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759-61 (5th Cir. 1999); *United States v. Gonzalez*, 190 F.3d 668, 672 (5th Cir. 1999); *United States v. Tellez*, 11 F.3d 530, 532 (5th Cir. 1993).  The Rangers received information that a wanted felon had claimed to own the car

they were stopping.  *See* SOF ¶¶ 20, 22.  This felon had recently fled from a Border Patrol checkpoint and been involved in a violent confrontation with law enforcement officers.  *See id.* ¶¶ 1-14, 22.  And the car he had claimed to own — the car now being stopped — was headed in the direction of a border crossing.  *See id.* ¶ 23.  Under these circumstances, the Rangers' decision to treat the stop as high-risk was eminently reasonable.

The additional events that lengthened the stop — conducting records checks, administering a preliminary breath test, and briefly questioning the Kia's occupants — were all reasonable parts of the stop.  As part of a traffic stop, law enforcement officers may examine driver's licenses, run records checks, and ask about the purpose and itinerary of the trip.  *Pack*, 612 F.3d at 350; *United States v. Brigham*, 382 F.3d 500, 508 (5th Cir. 2004) (en banc).  And when they develop reasonable suspicion of other criminal activities while performing these checks, they may extend the stop.  *Pack*, 612 F.3d at 350.  Here, examining Plaintiff Davila's license showed that it was expired and that he was therefore driving without a license in violation of law.  *See* Tex. Transp. Code Ann. §§ 521.021, .025; *see also* 36 C.F.R. § 4.2 (making state traffic laws applicable within national parks).  Moreover, as they were asking Plaintiff Davila about his travel plans, the Rangers noticed the smell of alcohol on him.  The smell of alcohol, *see* SOF ¶ 51, the observation that the car had been weaving, *see id.* ¶ 31, and Plaintiff Davila's admission that he had been drinking, *see id.* ¶ 52, all supported a reasonable suspicion that he was driving under the influence of alcohol.  *See* 36 C.F.R. § 4.23 (prohibiting driving under the influence of alcohol in national parks).  The Rangers were therefore justified in administering a preliminary breath test, *see* SOF ¶¶ 53-55, to resolve those suspicions.  Ultimately, the stop took less than an hour — no longer than necessary to clear the vehicle, identify its occupants, run records, checks, and resolve concerns about Plaintiff Davila's driving after drinking alcohol and without a valid license.  *See* SOF ¶ 59.  Therefore, the conduct and scope of the stop were reasonable under the Fourth Amendment.

Even if this Court found that the stop violated the Fourth Amendment, the Rangers would still be immune because the law did not clearly prohibit the Rangers' actions.  Qualified immunity is designed to ensure that fear of liability does not deter vigorous enforcement of the

law.  *Anderson*, 483 U.S. at 638.  Additional latitude is especially warranted when the question is one of reasonable suspicion, an area in which the courts have "consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry."  *Ohio v. Robinette*, 519 U.S. 33, 39 (1996); *see also Arvizu*, 534 U.S. at 274 (noting that Supreme Court has "deliberately avoided reducing [reasonable suspicion] to a neat set of legal rules").  In the situation they confronted, the Rangers crossed no bright-line boundaries.  Therefore, qualified immunity shields them from Plaintiffs' claims of unreasonable seizure.

## II.    THE RANGERS ARE ENTITLED TO QUALIFIED IMMUNITY FROM PLAINTIFFS' UNLAWFUL-SEARCH CLAIMS BECAUSE THE LIMITED PROTECTIVE SWEEP OF THE CAR DID NOT VIOLATE ANY CLEARLY ESTABLISHED FOURTH AMENDMENT RIGHTS.

In their Fifth Cause of Action, Plaintiffs also allege that the Rangers "searched the vehicle in which Plaintiffs were traveling without their consent and without legal authority."  Compl. ¶ 87.  No full-scale search occurred; rather, the Rangers briefly checked the back seat and trunk to ensure that no one was concealed there.  SOF ¶¶ 40-43.[2]  This quick check for officer safety did not violate any of Plaintiffs' clearly established Fourth Amendment rights.

### A.    Plaintiff Duarte lacks Fourth Amendment standing to challenge any search of the car.

The fundamental obstacle to Plaintiff Duarte's search claim is that she had no Fourth Amendment right not to have the car searched.  "'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'"  *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)); *see also Pack*, 612 F.3d at 347.  Courts call the question whether or not someone is asserting a violation of her own Fourth Amendment rights one of "standing."  *Pack*, 612 F.3d at 347.  A passenger in a vehicle has no Fourth Amendment right against search of that vehicle or its trunk and thus no Fourth Amendment standing to challenge that search.  *See Rakas*, 439 U.S. at 148-

---

[2] The Rangers also retrieved, with consent, a bag Plaintiff Duarte said contained her driver license and a bag passenger R.F.D. said contained his identification.  SOF ¶¶ 45-47.  Plaintiffs do not appear to premise any claim on these actions.  Likewise, although Plaintiffs allege that the Rangers damaged the vehicle in attempting to open the (already broken) trunk lock, *see* Compl. ¶¶ 50-51, they do not appear to premise any claim on that damage.

49.  Plaintiff Duarte does not allege that she was anything other than a passenger in the car. Therefore, she cannot bring a Fourth Amendment claim based on a search of the car.

### B.   The Rangers' protective sweep of the car's back seat and trunk for concealed persons did not violate Plaintiffs' clearly established Fourth Amendment rights.

The "touchstone" of any Fourth Amendment analysis of an officer's protective conduct is reasonableness under all the circumstances.  *Michigan v. Long*, 463 U.S. 1032, 1051 (1983). "[R]oadside encounters between police and suspects are especially hazardous," *id.* at 1049, and officers conducting a stop are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop."  *United States v. Hensley*, 469 U.S. 221, 235 (1985).  Accordingly, courts have approved protective sweeps of automobiles when officers had "objective reason to fear for his safety or the safety of others."  *United States v. Wallen*, 388 F.3d 161, 165 (5th Cir. 2004); *see, e.g.*, *Long*, 463 U.S. at 1049-51 (approving protective sweep for weapons where suspect appeared dangerous); *United States v. Ibarra-Sanchez*, 203 F.3d 356, 357 (5th Cir. 2000) (approving protective sweep to protect officer safety where officers had reason to believe drugs and weapons were inside van).

The Rangers had objective reason to fear for their safety and the safety of others, and thus their limited protective sweep was reasonable.  The car the Rangers stopped was associated with a felon wanted on pending federal charges.  SOF ¶¶ 15-17, 20, 22. That felon had a history of violence toward law enforcement and attempting to evade capture.  SOF ¶¶ 20, 22.  And the car associated with him was headed toward the U.S.–Mexico border.  SOF ¶ 23.  All these facts supported a reasonable concern that someone — indeed, someone prone to violence and hostile to law enforcement — could have been hiding in the car as part of a plan to escape to Mexico. *Cf. Maryland v. Buie*, 494 U.S. 325, 333 (approving protective sweep of home to guard against danger that house could be "harboring other persons who are dangerous and who could unexpectedly launch an attack").  Given this concern, a protective sweep to ensure no one was hiding in the car or its trunk was entirely reasonable and consistent with the Fourth Amendment.

At a minimum, the protective sweep was not so clearly inconsistent with the Fourth Amendment that immunity would not protect the Rangers.  There is "'no ready test for

determining reasonableness other than by balancing the need to search . . . against the invasion which the search . . . entails.'" *Long*, 463 U.S. at 1046 (quoting *Terry*, 392 U.S. at 21). Even then, this balancing depends on all the circumstances of a particular case. *See id.* at 1051. When a constitutional test is so general, and its results so context-dependent, qualified immunity protects an officer making difficult judgment calls unless the illegality of his conduct is "obvious." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam). Given the weighty and legitimate concerns for safety and the relatively minor intrusion of looking into the passenger cabin and opening the trunk, a constitutional violation would not have been obvious to a reasonable officer. Therefore, the Rangers are immune.

### III. THE RANGERS ARE ENTITLED TO QUALIFIED IMMUNITY FROM PLAINTIFFS' EXCESSIVE-FORCE CLAIMS BECAUSE THE USE OF FORCE WAS NOT CLEARLY EXCESSIVE IN LIGHT OF THE SITUATION THE RANGERS CONFRONTED.

In their Sixth Cause of Action, Plaintiffs allege the Rangers used excessive force in violation of the Fourth Amendment. In particular, Plaintiffs complain that Rangers aimed weapons at them, *see* Compl. ¶ 95; that Rangers required Plaintiff Davila to kneel while handcuffed, *see* Compl. ¶ 93; and that when Plaintiff Duarte was told to kneel while handcuffed, she was positioned by the exhaust pipe of a running vehicle, *see id.* ¶ 94. Even if these actions could be characterized as uses of force, none of them would have violated the Fourth Amendment. To recover on an excessive-force claim, a plaintiff must show "(1) an injury (2) which resulted from the use of force that was clearly excessive to the need and (3) the excessiveness of which was objectively unreasonable." *Hill v. Carroll County, Miss.*, 587 F.3d 230, 234 (5th Cir. 2009). Whether a use of force was objectively reasonable is a question of law. *Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008). The reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and "must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).

Viewed from the perspective of a reasonable officer on the scene, the situation the Rangers confronted appeared to be potentially dangerous. The car the Rangers were stopping was associated with a violent fugitive with an active warrant for his arrest. *See* SOF ¶¶ 16-17, 20, 22; *cf. United States v. Tellez*, 11 F.3d 530, 533 (5th Cir. 1993) (recognizing situation as "potentially dangerous" where officers stopped a truck with three passengers, one of whom had an active warrant). The Rangers could not immediately confirm, without putting themselves in a vulnerable position, that the fugitive was not inside the car. *Cf. Tellez*, 11 F.3d at 533 (recognizing that requiring officer to look through truck's windshield to see whether it was carrying a wanted passenger "would have forced the officers to place themselves in a much more vulnerable position than simply requiring the passengers to get out of the vehicle where the officers could screen the occupants for weapons and guard themselves against attack").

Given this unenviable task, the Rangers responded with an objectively reasonable level of force. Traffic stops are "especially fraught with danger to police officers," *Long*, 463 U.S. at 1047, and "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *United States v. Sanders*, 994 F.2d 200, 203 (5th Cir. 1993). Therefore, during a traffic stop, officers are "authorized to 'take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" *United States v. Campbell*, 178 F.3d 345, 348-49 (5th Cir. 1999) (quoting *Hensley*, 469 U.S. at 235). Everything the Rangers did was reasonably necessary to protect their personal safety and to maintain the status quo during the course of this stop. *See Garza v. United States*, 881 F. Supp. 1099, 1102 (S.D. Tex. 1995) (approving use of identical tactics in similar traffic stop).

For instance, the Rangers' decision to draw their weapons, aim them at the car, and have them at the ready while they cleared the car was reasonable. *Cf. id.* "The risk of harm to both the police and the occupants [of a stopped vehicle] is minimized . . . if the officers routinely exercise unquestioned command of the situation." *Arizona v. Johnson*, 129 S. Ct. 781, 786 (2009) (alterations in *Johnson*, internal quotation marks omitted). Drawing a firearm is a reasonable way to exercise "unquestioned command of the situation" when someone with a

history of violently resisting arrest could be present.  *See United States v. Bullock*, 71 F.3d 171, 179 (5th Cir. 1995) (holding that officers were "justified in drawing their weapons" where they were dealing with "a dangerous man, one who had previously resisted arrest and threatened police.").  As the Fifth Circuit has explained, drawing a weapon "may actually have the effect of decreasing violence" because "[b]y giving a police officer the ability to pull out and point a service revolver at someone without risking tort liability, he may be able to abort a potentially violent situation."  *Hinojosa v. City of Terrell, Tex.*, 834 F.2d 1223, 1231 (5th Cir. 1988).

Having weapons at the ready did not suddenly become unreasonable once Plaintiffs were handcuffed.  The Fifth Circuit has rejected "the assumption that, by handcuffing a suspect, the police instantly and completely eliminate all risks that the suspect will flee or do them harm" as having "no basis in fact."  *Sanders*, 994 F.2d at 209.  The court explained:

> Handcuffs are a temporary restraining device; they limit but do not eliminate a person's ability to perform various acts.  They obviously do not impair a person's ability to use his legs and feet, whether to walk, run, or kick.  Handcuffs do limit a person's ability to use his hands and arms, but the degree of the effectiveness of handcuffs in this role depends on a variety of factors, including the handcuffed person's size, strength, bone and joint structure, flexibility, and tolerance of pain.  Albeit difficult, it is by no means impossible for a handcuffed person to obtain and use a weapon concealed on his person or within lunge reach, and in so doing to cause injury to his intended victim, to a bystander, or even to himself.  Finally, like any mechanical device, handcuffs can and do fail on occasion.

*Id*.

The Rangers' decision to have Plaintiffs kneel was also objectively reasonable.  *Cf. Garza*, 881 F. Supp. at 1101-02.  Having a person kneel prevents two common behaviors that can cause a stop to escalate — fight and flight.  SOF ¶ 37; *cf. Sanders*, 994 F.2d at 207 ("If a suspect complies with a police order to lie face down on the ground, his ability to fight or flee is significantly reduced, thereby helping to preserve the status quo.").  This measure also fails to amount to excessive force because if any injury flowed from it, that injury could only be *de minimis*.  To prevail on an excessive force claim, the injury must be more than *de minimis*.  *Lockett v. New Orleans City*, 607 F.3d 992, 999 (5th Cir. 2010) (per curiam).  Plaintiffs do not even allege any specific injury that flowed from the kneeling, much less one that could support an excessive force claim.

Plaintiff Duarte's allegation that she was kneeling near an exhaust pipe, even if true, would not change this analysis.  Temporary discomfort, even "fleeting dizziness, temporary loss of breath and coughing" does not "rise[] to the level of a constitutional violation."  *Williams v. Bramer*, 186 F.3d 699, 704 (5th Cir. 1999) (characterizing as "de minimis" injuries resulting from officer allegedly choking suspect during search of his mouth).  Rangers had Plaintiff Duarte kneel a few feet from a vehicle for a few minutes while they finished calling the third passenger from the car and briefly checked the passenger cabin for concealed persons.  SOF ¶¶ 39-41.  Even if some temporary discomfort resulted, that discomfort does not amount to the sort of injury that could support an excessive-force claim.

In any event, the Rangers would still be entitled to qualified immunity.  The right at issue is not the "broad general proposition" that the Fourth Amendment forbids excessive force.  *Brosseau*, 543 U.S. at 198 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified on other grounds*, *Pearson*, 129 S. Ct. at 818); *Manis v. Lawson*, 585 F.3d 839, 846 n.4 (5th Cir. 2009).  Rather, qualified immunity hinges on whether the right was "'clearly established'" in the "'particularized'" sense that it would have been "'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) (quoting *Saucier*, 533 U.S. at 202).  Qualified immunity "protects an officer with a mistaken, yet reasonable, understanding of the law from the 'hazy border between excessive and acceptable force.''  *Manis*, 585 F.3d at 846.  Nothing in preexisting case law would have made clear to the Rangers that any of their actions obviously transgressed this hazy border.  Faced with the possibility of confronting a dangerous, wanted fugitive in a remote location, their decisions to treat the stop as high-risk and to adopt the techniques that accompany a high-risk stop was not unreasonable, much less clearly so.  Therefore, qualified immunity shields them from Plaintiffs' excessive force claim.

## CONCLUSION

The touchstone of the Fourth Amendment is reasonableness, and at every stage, the Rangers' actions were reasonable in the circumstances they confronted.  Even if this Court were to deem their actions unreasonable in hindsight, the law was not so clearly established as to compel that conclusion in April 2009.  The Rangers are therefore entitled to qualified immunity, and this Court should grant them summary judgment.

Respectfully submitted,

TONY WEST
Assistant Attorney General

C. SALVATORE D'ALESSIO
Acting Director, Constitutional Torts Section

RICHARD MONTAGUE
Senior Trial Counsel, Constitutional Torts Section

/s/
ZACHARY RICHTER, Texas Bar No. 24041773
Trial Attorney, Constitutional Torts Section
United States Department of Justice, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C.  20044
(202)616-4199 (phone)
(202)616-4314 (fax)

*Attorneys for the United States, Iftikhar Khan, Phil Basak, Brian L. Sikes, Mark Spier & Blake Trester*

**CERTIFICATE OF SERVICE**

I certify that on May 2, 2011, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to these CM/ECF participants:

Javier Saenz
Texas Rio Grande Legal Aid
1331 Texas Ave
El Paso, TX 79901
jsaenz@trla.org

Amanda Jane Chisholm
Texas RioGrande Legal Aid
114 North 6th Street
Alpine, TX 79830
achisholm@trla.org

Susan L. Watson
Texas RioGrande Legal Aid
311 Plus Park Blvd., Suite 135
Nashville, TN 37217
swatson@trla.org

/s/ _____
Zachary Richter